Christopher L. Springer SBN (291180)
cspringer@kellerrohrback.com
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA     93101
(805) 456-1496, Fax (206) 623-3384

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| MARK WILL,<br><br>Plaintiff.<br><br>v.<br><br>HYUNDAI MOTOR COMPANY; HYUNDAI MOTOR AMERICA; KIA CORPORATION; KIA AMERICA, INC.; AND VERISK ANALYTICS, INC.,<br><br>Defendants. | No. 8:24-cv-01653<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mark Will alleges the following based upon personal knowledge, information and belief, the investigation of his attorneys, and publicly available materials. He brings this case on behalf of himself and all others similarly situated, against Defendants Hyundai Motor Company, Hyundai Motor America, Kia Corporation, and Kia America, Inc. (collectively, "Hyundai Kia"), and Verisk Analytics, Inc.

### I.     INTRODUCTION

1. Hyundai Kia has been selling data about the driving behavior of millions of people without informing affected drivers.

1

2. Hyundai Kia vehicles feature "connected car" services branded as UVO Connect, Kia Connect, Bluelink, and Bluelink+.  In marketing, Hyundai Kia says that this technology provides emergency services, promotes safe driving, and allows for over-the-air emergency software updates.

3. But what their marketing materials don't say is that this same technology also collects a vast amount of driving data, from trip reports to "hard braking" events.

4. Hyundai Kia does not advertise that it sells that driving data to the insurance industry.

5. Verisk is a data broker that sells data about people to insurance companies.

6. Verisk buys Hyundai Kia's driver data, uses the data to perform risk "analyses" of individual drivers, and sells the data to auto insurance companies who ask for it.

7. This invasion of privacy occurred without Hyundai Kia drivers' knowledge or consent.  As a result, in addition to their loss of privacy, Hyundai Kia drivers have seen their auto insurance premiums increase and have had trouble securing coverage.

## II. JURISDICTION AND VENUE

8. This court has original subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiffs bring a claim under the Fair Credit Reporting Act, a federal law.

9. This court also has original subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one member of the proposed class is a citizen of a state different from that of defendants; the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and the proposed class comprises more than 100 class members.

10. This Court has personal jurisdiction over defendants under 28 U.S.C. §

1407, because each defendant has sufficient minimum contacts in this District and because each defendant has otherwise intentionally availed itself of the markets within the District through business activities, such that the exercise of jurisdiction by this Court is proper and necessary.

    A.  Hyundai Motor Company and Kia Corporation design, manufacture, market, distribute, and sell the vehicles with driving data-tracking technology under their registered trademarks "Hyundai" and "Kia." The vehicles were sold in this District and the companies purposefully availed themselves of the United States' legal protections by registering and maintaining registrations with the United States government for trademarks associated with their vehicles and parts, which the companies used to identify and distinguish their vehicles and parts in the United States and this District, and by delivering and selling hundreds of thousands of vehicles through their subsidiaries, Hyundai Motor America and Kia America, each of which has its headquarters within this District and this Division.

    B.  Verisk's business—and specifically the conduct complained of here in its business relationship with the Hyundai and Kia Defendants—included the acquisition of data collected by defendants located within this District and this Division, and included the acquisition and sale of data about driving behavior that occurred in California and in this District.

  11.  Venue is proper under 28 U.S.C. § 1391(b)(1) & (2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III. PARTIES

**A. Plaintiffs**

12. Plaintiff Mark Will resides in Illinois. He purchased a new 2019 Hyundai Santa Fe and has an active Bluelink Subscription. He has no knowledge of ever agreeing to the sharing and use of his driving data. His Verisk report demonstrates that Hyundai shared his driving behavior with Verisk between December 2023 and April 2024. He believes his driving data was shared with insurance companies, including his auto insurance provider, because his rate increased by approximately $250 without other justification of which he is aware.

**B. Defendants**

13. Defendant Hyundai Motor Company is a multinational automaker headquartered in Seoul, South Korea. Together with Defendants Kia Corporation, Kia America, Inc., and Hyundai Motor America, it constitutes the Hyundai Motor Group, which designs, manufactures, and distributes the vehicles discussed in this Complaint. It is the parent of Hyundai Motor America.

14. Defendant Hyundai Motor America is an automobile designer, manufacturer, distributor, and/or servicer of new motor vehicles under the Hyundai brand doing business within the United States. It is incorporated and headquartered in the State of California. Its principal place of business is located at 10550 Talbert Avenue, Fountain Valley, California. It distributes, markets, leases, warrants, and oversees regulatory compliance and warranty claims for Hyundai-brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California.

15. Defendant Kia Corporation is a multinational automaker headquartered in Seoul, South Korea. Kia Corporation is the parent corporation of Kia America, Inc. As

of December 31, 2017, Defendant Kia Corporation's largest shareholder was Defendant Hyundai Motor Company, which holds 33.88% of Kia Corporation's stock. Kia Corporation, including through its subsidiary located in this District, engages in continuous and substantial business in California.

16. Defendant Kia America, Inc., is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the State of California. Kia America's principal place of business is located at 111 Peters Canyon Road, Irvine, California. KA distributes, markets, leases, warrants, and oversees regulatory compliance and warranty claims for Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California.

17. Hyundai Motor Company and Kia Corporation exercise control over Hyundai Motor America and Kia America, respectively. Upon information and belief, the foreign companies possess the power to appoint board members to their respective American counterparts, and both foreign companies have exercised this power. In addition, senior executives from both foreign companies regularly visit Hyundai and Kia plants and offices throughout the United States, including Hyundai Motor America and Kia America's California headquarters.

18. Defendant Verisk Analytics, Inc. is a corporation headquartered in Jersey City, New Jersey and incorporated in Delaware. Verisk is a data broker that provides analytics and technology to support insurers, including insurers in California and companies that provide insurance to customers in California. Verisk obtained driver data from Hyundai Kia and made it available to insurance companies.

## IV.  FACTS

**A.  Hyundai Kia collects driving data.**

19. Hyundai Bluelink was originally launched on the 2012 Sonata and available on almost every Hyundai model.

20. Bluelink allows drivers to remotely locate, start, lock, and unlock their car; run vehicle diagnostics to check for service issues; and use the navigation system. Hyundai also promotes Bluelink's enhanced roadside assistance, vehicle charging dashboard (for hybrid and electric vehicles), parental controls for teen drivers, automatic emergency assistance, panic notification, service link, and stolen vehicle recovery.

21. Hyundai often offered a free trial of Bluelink with the purchase of a new vehicle.

22. Kia vehicles had similar technology under the names UVO link and Kia Connect.

23. One "feature" of these programs was the "Driving Score," which Hyundai advertised "a way of helping you improve your driving." The Driving Score provided metrics or feedback for drivers to monitor their driving skills. Hyundai said that the Driving Score took into account criteria such as smooth driving, speed responsibility, driving consistency, total driving hours, and driving time of day.

**B.  Hyundai Kia sells the driving data to Data Brokers, who pass it on to insurers.**

24. In March 2024, the New York Times broke the news that GM was selling driving data collected through its connected services, OnStar, to two data brokers that cater to the auto insurance industry—LexisNexis and Verisk.

25. Later reporting revealed that Hyundai Kia was doing the same thing: selling their drivers' data to the data brokers without the drivers' full knowledge and

consent. And although Hyundai Kia's connected systems collect many types and large volumes of driving data, the data sold to LexisNexis and Verisk often lacks the context. For example, the shared data would not include information to explain the hard-braking incidents included in the report.

26. Nevertheless, Verisk analyzed the purchased driving data to create a "risk score" for individual people that purports to reflect their driving abilities.

27. Verisk then sold the data and their "analyses" of it to automotive insurance companies. Those companies use the LexisNexis and Verisk reports to set or modify drivers' auto insurance quotes or premiums.

28. LexisNexis operates a "Telematics Exchange," a "portal for sharing consumer-approved connected car data with insurers." As of 2022, the exchange, according to a LexisNexis news release, had "real-world driving behavior" collected "from over 10 million vehicles."

29. Verisk similarly advertises to insurance companies its "[r]eliable, granular data and analytics on drivers, vehicles, and households" that can help insurance companies "confidently navigate a volatile personal auto market."

30. Verisk claims that "…growing numbers of insurers use the exchange [that is, Verisk's "Data Exchange" product" for underwriting and claims solutions…".

31. As a result of these offerings, some Hyundai Kia drivers have seen increased auto insurance premiums, or had trouble securing insurance at all.

C. **Drivers do not consent to the collection, sale, and use of their driving data**

    1. **Hyundai Kia could have obtained drivers' explicit and knowing consent to the use of driving data.**

32. In recent years, insurance companies have offered incentives to people who, by choice, install devices in their cars or download smartphone apps that monitor

7

their driving, including how much they drive, how fast they take corners, how hard they hit the brakes, and whether they speed.

33. Car companies have established relationships with insurance companies, so that if drivers want to sign up for what's called usage-based insurance — where rates are set based on monitoring of their driving habits — it's easy to collect that data wirelessly from their cars.

34. But "drivers are historically reluctant to participate in these programs," as Ford Motor put it in a patent application.

35. Defendants' scheme circumvents that reluctance by surreptitiously collecting, selling, and using driving data.

36. Plaintiff did not know that Hyundai Kia was sharing his driving data with Verisk, and in turn with insurance companies. He would not have knowingly consented to Hyundai Kia's collection and sharing of his driving data with Verisk.

37. Plaintiff did not know that Verisk was sharing his driving data with insurance companies. He would not have knowingly consented to Verisk's sharing of his driving data with insurance companies, much less the use of the driving data to purportedly analyze his driving abilities and determine his insurance rates.

38. Plaintiff now believes that Hyundai Kia provided his driving data to Verisk, and that Verisk provided the driving data to insurance companies. Plaintiff believes that the rise in his auto insurance premiums was caused by defendants' driving data sharing practices, and that defendants' driver-data collection and sharing practices invaded his privacy.

**2. Bluelink and Driving Score enrollment mislead drivers.**

39. It is unclear to many drivers how they became enrolled in Bluelink and

Driving Score.

40. According to reporting and consumer forums, some Hyundai Kia drivers say they were enrolled without their knowledge.

41. While some drivers might opt to enroll in the services through their phone app or the driver infotainment screen in their vehicle, other drivers appear to have been enrolled at the time they purchased the vehicle without their knowledge, and, on information and belief, dealerships may receive incentives for enrolling drivers.

42. Bluelink and similar services may be offered to new drivers on a trial basis (e.g., free for the first three months) or as a mandatory subscription on top of the vehicle's base price.

43. Newer Hyundai vehicles offer Bluelink+ "at no additional cost for the original owner."

44. These enrollment processes do not provide car buyers with an adequate opportunity to review and understand the terms of the enrollment, and Plaintiff believes that dealership employees are not trained to understand or fully disclose the terms of the services.

**3. Bluelink's terms and conditions did not put drivers on notice that their data would be sold and used by insurance companies.**

45. Even drivers who somehow accepted the Bluelink and Driving Score terms did not adequately consent to the sharing and use of their driver data.

46. Hyundai Kia provided no notice to drivers about the sale of their driving data to data brokers.

47. Hyundai Kia mislead customers about the purposes of Bluelink and Driving Score. Hyundai Kia markets Bluelink and Driving Score as features that improve driver safety; allow drivers to access software updates; and give drivers a better

9

understanding of their own behaviors.

**D.     Drivers are harmed.**

48.     Hyundai Kia deceives drivers into believing that it is collecting their driving data in order to help them become safer drivers—if the driver is aware of the data collection at all.  Defendants all profit from the sale of the driving data at the expense of the drivers, who don't see a penny from the sale of their data.

49.     Defendants' scheme violates drivers' privacy.

50.     The driving data that Hyundai Kia sells is highly personal.  Drivers do not expect that their car company is selling trip-by-trip reports to data brokers.

51.     Defendants' practices came as a surprise to Hyundai Kia drivers and the public.  California's privacy regulator is currently investigating automakers' data collection practices, and last month, Senator Edward Markey of Massachusetts also urged the Federal Trade Commission to investigate.

52.     Jen Caltrider, a researcher at Mozilla who researches automotive privacy policies, said that drivers have little idea about what they are consenting to when it comes to data collection.  She said it is "impossible for consumers to try and understand" the legalese-filled policies for car companies, their connected services and their apps.  She called cars "a privacy nightmare."

53.     Defendants' scheme also results in increased insurance premiums for drivers.  As a result of LexisNexis and Verisk's reports, drivers are seeing their existing insurance rates increase, or have trouble securing coverage at all.  This occurs even though the driving data, and in turn LexisNexis's and Verisk's "analyses" lack context (e.g., driving conditions) for the reported driving behavior.

## V. STATUTE OF LIMITATIONS

54. Defendants did not disclose how they sold or otherwise used driving data.

55. Instead, Hyundai Kia actively concealed their collection and sale of the data by misleading drivers about the purpose and function of Bluelink and Driving Score.

56. Defendants kept their behavior secret because they understood that many drivers would not knowingly consent to this sale and use of their data.

57. As a result of defendants' fraudulent concealment of the driving data use and sale, it was not until the March 2024 New York Times articles that the public and Hyundai Kia drivers understood the truth.

58. Thus, any applicable statute of limitations has either been tolled or accrued only in 2024, when the defendants' scheme was publicly reported.

59. In addition, defendants' actions and omissions constituted overt acts that began a new statute of limitations because those acts advanced the unfair objectives of the scheme. Each transmission of driver data to LexisNexis, Verisk, and insurance companies were new and independent acts that perpetuated the scheme.

## VI. CLASS ALLEGATIONS

60. Plaintiff brings this case as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), on behalf of himself and all other similarly situated.

61. Plaintiffs bring this case on behalf of classes as defined as follows:

    A. <u>The class</u>: All people whose Hyundai Kia-manufactured vehicles collected and shared driving data with LexisNexis and/or Verisk.

    B. <u>The consumer-report subclass</u>: A subset of the class including Plaintiff Will and those class members whose Hyundai Kia-reported

driving data appeared on a Verisk report provided to a third party.

        C.    <u>The Illinois subclass</u>: A subset of the class encompassing Plaintiff Will and those class members who reside in Illinois.

62.    Excluded from these classes are defendants and their employees or agents and any judicial official presiding over this action, and members of their families.

63.    There are thousands of members of the proposed classes, and the classes are thus so numerous that joinder of all members is impracticable. Identification of the class members is a matter capable of determination from defendants' records.

64.    Defendants have acted or refused to act on grounds that apply generally to the classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to the class as a whole.

65.    Common questions of law and fact exist as to all members of the classes. These questions predominate over any questions solely affecting individual members of the classes. Among the questions of law and fact common to the classes are:

        A.    What types of driving data Hyundai Kia regularly collected;

        B.    What types of driving data Hyundai Kia regularly shared and sold;

        C.    Whether defendants' practices were unfair and deceptive;

        D.    Whether class members consented to defendants' practices;

        E.    Whether defendants' practices constitute an invasion of privacy;

        F.    Whether defendants' conduct was knowing and willful;

        G.    Whether defendants profited from their practices;

        H.    Whether defendants are liable for damages, and the amount of

such damages; and

I. Whether defendants' conduct should be enjoined.

66. Plaintiff will fairly and adequately represent the classes, protecting the interests of the class members. Plaintiff has retained competent counsel experienced in class action litigation and intends to prosecute this action vigorously.

67. Plaintiff Will is a member of the consumer-report and Illinois subclasses, and does not have interests antagonistic to, or in conflict with, the interests of the other members of the classes and subclasses.

68. Plaintiff's claims are typical of the claims of the members of the classes and subclasses.

69. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII. CLAIMS FOR RELIEF

**A. Claim 1. Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b), brought by plaintiff Will on behalf of himself and the consumer-report subclass against Verisk**

70. Plaintiff Will incorporates the allegations above.

71. The Fair Credit Reporting Act promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies while also satisfying the important commercial need for consumer reports. 15 U.S.C. § 1681; *see TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001).

72. Verisk is a consumer reporting agency regulated by the Act.

73. Plaintiff and subclass members are persons and consumers protected by the Act.

74. The reports that Verisk provided to auto insurance companies are consumer

reports governed by the Act, because they bear upon the consumer's character, general reputation, and mode of living and are used or collected, at least in part, to establish eligibility for insurance.

75. Consumer reporting agencies must follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom a report relates. 15 U.S.C. § 1681e(b).

76. Verisk did not implement procedures to assure maximum possible accuracy regarding plaintiff's and the subclass's driving data. Instead, the reports presented the driving data as an accurate measure of plaintiff's and the subclass's abilities, even though the reports lacked context for the reported driving events, including who was actually driving the vehicle at the time of the event.

77. Verisk knew that the reported driving data would be used to set and modify the insurance premiums of plaintiff and the subclass.

78. Verisk knowingly and willfully collected and produced inaccurate data metrics regarding plaintiff's and the subclass's driving data.

79. As a result of Verisk's conduct, insurance companies and others who view the consumer reports receive and rely on an inaccurate representation of plaintiff's and the subclass's driving abilities.

80. These deceptive acts and practices constitute reckless or negligent violations of the Fair Credit Reporting Act.

81. As a result of the willful violations, plaintiff and the subclass are entitled to actual, statutory, and punitive damages under 15 U.S.C. § 1681(n)(a)(1) and reasonable attorney fees and costs under 15 U.S.C. § 1681n(a)(3).

82. As a result of the negligent violations, plaintiff and the subclass are entitled

to actual damages under 15 U.S.C. § 1681o(a)(1) and reasonable attorney fees and costs under 15 U.S.C. § 1681o(a)(2).

**B.     Claim 2.  Violation of 815 Ill. Comp. Stat. 505/1 et seq., brought by plaintiff on behalf of himself and the Illinois subclass against all defendants**

83.     Plaintiff incorporates the allegations above.

84.     Defendants' deceptive scheme to collect, sell, and use driving data without plaintiffs' and the class's knowledge or consent violates the Illinois Consumer Fraud and Deceptive Business Practices Act because it is an unfair and deceptive business practice.

85.     Defendants intended to profit from the data sharing practices and intended to keep plaintiffs and the class in the dark about the practices. Their practices were thus deceptive.

86.     Hyundai Kia's marketing, promotions, and descriptions of Bluelink intended to misrepresent to and conceal from plaintiffs and the class the purposes and capabilities of Bluelink and Driving Score. As a result, plaintiff and the class did not learn the material fact that Hyundai Kia was sharing their driving data with the insurance industry and were harmed when their data was in fact shared.

87.     Verisk intended for drivers to not learn about the sale of their data to insurance companies. They did not notify plaintiffs that their information was being collected and sold, much less for purposes of increasing their car insurance rates. As a result, plaintiff and the class did not learn the material fact that Verisk was sharing their driving data with insurance companies and were harmed when their data was in fact shared.

88.     Defendants' practices were also unfair. Sharing private data without a person's consent offends Illinois's public policy towards protection of and autonomy for

consumer data. Defendants' practices are also unscrupulous, because they entice consumers with benefits that lead to them unwittingly offer up their data for Defendants' benefit. Finally, Defendants practices causes substantial injury to consumers, because the practice results in the disclosure of large amounts of driving data without any benefit to consumers.

89. Defendants should have realized that sharing this driving data inaccurately portrays plaintiff's and the class's driving experience and can unfairly negatively impact their eligibility for and/or cost of insurance.

90. Defendants caused harm because their practices invaded plaintiff's and the class's privacy, profited from plaintiffs' the class's data without compensation, misreported plaintiff's and the class's driving abilities, and caused insurance rates to increase. Plaintiff and the class would not have consented to defendants' practices, had they known about them.

91. As a result of the violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, plaintiff and the class are entitled to actual damages, statutory damages, punitive damages, injunctive relief, and reasonable attorney's fees and costs.

**C.    Claim 3.  Unjust enrichment, brought by plaintiff on behalf of himself and the class against all defendants**

92. Plaintiff incorporates the allegations above.

93. Plaintiffs and the class unknowingly conferred the benefit of their driving data on defendants.

94. Defendants knew and appreciated that benefit: Hyundai Kia sold the information to LexisNexis and Verisk, and LexisNexis and Verisk in turn sold the information to insurance companies. Plaintiffs and the class received no benefit from this sale and use of their data; it is inequitable for defendants to retain the profit without

payment for its value.

95. Therefore, defendants have been unjustly enriched and plaintiffs and the class are entitled to restitution.

**D. Claim 4. Invasion of privacy, brought by plaintiff on behalf of himself and the class against all defendants.**

96. Plaintiff incorporates the allegations above.

97. Plaintiff's and the class's driving data is sensitive information, information that plaintiffs and the class wanted to remain private and nonpublic.

98. In part because of defendants' own representations, plaintiffs and the class reasonably expected that their driving data would be protected and secured against access by third parties and would not be disclosed to or obtained by unauthorized parties, or disclosed or obtained for any improper purpose. Plaintiff and the class thus had a right against improper intrusion into their data.

99. Defendants intentionally intruded on the private affairs and concerns of plaintiffs and the class by improperly accessing plaintiff's and the class's driving data and using it for profit and to report on plaintiff's and the class's driving abilities to auto insurance companies. Plaintiffs and the class did not knowingly consent to these practices.

100. Defendants' intrusions upon the private affairs and concerns of plaintiff and the class were substantial and would be highly offensive to a reasonable person.

101. Defendants' intrusions harmed plaintiff and the class in that their practices invaded plaintiffs' and the class's privacy, profited from plaintiff's and the class's data without compensation, misreported plaintiff's and the class's driving abilities, and caused insurance rates to increase.

102. Plaintiff and the class seek appropriate relief for those injuries, including

damages that that will reasonably compensate plaintiff and the class for the harm to their privacy interests and disgorgement of profits made by defendants as a result of their intrusions.

## VIII. PRAYER FOR RELIEF

103. Plaintiff, on behalf of himself and other members of the class and subclasses, asks the court for the following relief:

    A.    An order certifying the proposed class and subclasses under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), designating plaintiff as named representative of the class and subclasses, and appointing the undersigned attorneys as class counsel under Rule 23(g);

    B.    Actual damages;

    C.    Statutory damages;

    D.    Punitive damages;

    E.    An order enjoining Hyundai Kia from sharing plaintiffs' and the class's driving information with Verisk and LexisNexis;

    F.    An order enjoining Verisk from sharing plaintiffs' and the class's driving information with their insurance customers;

    G.    An order requiring Verisk to delete plaintiff and class member driving data in their possession;

    H.    Attorney fees, expenses, and taxable costs;

    I.    Pre- and post-judgment interest; and

    J.    For other relief that the court deems just and proper.


## IX. JURY TRIAL DEMANDED

104. Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs on behalf of the class demand a trial by jury of all claims asserted in this complaint that are so triable.

DATED: July 29, 2024

                KELLER ROHRBACK L.L.P.

By */s/ Christopher L. Springer*
    Christopher L. Springer SBN (291180)
    cspringer@kellerrohrback.com
    801 Garden Street, Suite 301
    Santa Barbara, CA 93101
    Telephone: (805) 456-1496
    Facsimile: (206) 623-3384


    Derek W. Loeser (*pro hac vice* forthcoming)
    Gretchen Freeman Cappio (*pro hac vice* forthcoming)
    Cari C. Laufenberg (*pro hac vice* forthcoming)
    Ryan P. McDevitt (*pro hac vice* forthcoming)
    dloeser@kellerrohrback.com
    gcappio@kellerrohrback.com
    claufenberg@kellerrohrback.com
    rmcdevitt@kellerrohrback.com
    1201 Third Avenue, Suite 3400
    Seattle, WA 98101
    Telephone: (206) 623-1900
    Facsimile: (206) 623-3384

    ***Attorneys for Plaintiff***